**United States Bankruptcy Court**
**Northern District of California**
**San Francisco Division**

In re:

Case No. 21-30819
Chapter 11

KANE CORPORATION,

Debtor

_____/

**COMBINED PLAN OF REORGANIZATION**
**AND DISCLOSURE STATEMENT PROPOSED BY PETER KANE**
**(December 7, 2022)**

**INTRODUCTION**

This is a Combined Chapter 11 Plan of Reorganization and Disclosure Statement (the "Plan") filed by PETER KANE ("Mr. Kane"), a creditor and the sole equity security holder of the debtor herein, KANE CORPORATION (the "Debtor"). The Plan identifies each known creditor by name and describes how each claim will be treated if the Plan is confirmed.

Part 1 contains the treatment of creditors with general unsecured claims – Class A – they will be paid 15.75% of allowed claims, plus a pro rata share of any litigation net proceeds. Part 2 contains the treatment of priority and administrative claims – they will be paid in full to the extent allowed. Part 3 contains the treatment of equity interests – Class B – equity interests will be retained but there will be no distributions unless and until all other payment obligations under the Plan have been met. There are no secured claims. Part 4 contains treatment of executory contracts and unexpired leases. Parts 5 and 6 contain discharge and default provisions. Part 7 contains the appointment of a Special Representative for the benefit of creditors. Part 8 contains general provisions. Part 9 contains details and information regarding the Debtor's pension plan and the role and claims of the Pension Benefit Guaranty Corporation ("PBGC"), a wholly-owned United States government corporation, and an agency of the United States created by ERISA[1] with respect thereto.

---

[1] Meaning, the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. §§ 1301-1461 (2018), and the regulations promulgated thereunder.

Claims within Class A (general unsecured claims) will be impaired under the Plan, and creditors holding those claims are therefore entitled to vote on confirmation of the Plan. Equity interests within Class B (equity security holders) will be impaired under the Plan, and holders of those equity interests are entitled to vote on the confirmation of the Plan. Completed ballots must be received by Mr. Kane's counsel, and objections to confirmation must be filed and served, no later than _____, 2022. The court will hold a hearing on confirmation of the Plan on _____, 2022, at _____ .m. Addresses and other contact information are contained in the notice of confirmation hearing accompanying this document.

Attached to the Plan are exhibits containing financial information that may help you decide how to vote and whether to object to confirmation. **Exhibit 1** includes background information regarding the Debtor and the events that led to the filing of the bankruptcy petition and describes significant events that have occurred during this chapter 11 case and the preceding chapter 7 case. **Exhibit 2** contains an analysis of how much creditors would likely receive in a Chapter 7 liquidation. **Exhibit 3** contains an analysis of the Debtor's ability to perform its Effective Date obligations, as a matter of feasibility.

Whether the Plan is confirmed is subject to complex legal rules that cannot be fully described here. You are strongly encouraged to read the Plan carefully and to consult an attorney to help you determine how to vote and whether to object to confirmation of the Plan.

If the Plan is confirmed, the payments promised in the Plan constitute new contractual obligations that replace the Debtor's pre-confirmation debts. Creditors may not seize their collateral or enforce their pre-confirmation debts so long as the Debtor performs all obligations under the Plan. If the Debtor defaults in performing Plan obligations, any creditor can file a motion to have the case dismissed or converted to a Chapter 7 liquidation, or to enforce their non-bankruptcy rights. The Debtor will be discharged from all pre-confirmation debts (with certain exceptions) if the Debtor makes all required Plan payments. Enforcement of the Plan, discharge of the Debtor, and creditors' remedies if the Debtor defaults are described in detail in Parts 5 and 6 of the Plan.

**PART 1:** <u>**TREATMENT OF GENERAL UNSECURED CREDITORS – Class A**</u>

(a) To the extent allowed, the general unsecured claims

asserted in this case, either as scheduled or as filed, are within Class A, as follows:

| Name of Creditor | Amount of Claim | Claim no. or Scheduled | Disputed Under Plan Y/N | Plan Proponent's Comment |
|---|---|---|---|---|
| Pahl & McCay, APC | 29,771.16 | 1 | Y | Not owed and subject to offsets |
| Cross River Bank | 24,630.00 | 3 | Y | Subject to forgiveness under applicable law. |
| Peter Kane | 3,185,706.34 | 4 | N | Allowed and to be subordinated |
| Pension Benefit Guaranty Corporation | 0.00 | 7 | Y | Pension plans will not be terminated. |
| Pension Benefit Guaranty Corporation | 0.00 | 8 | Y | Pension plans will not be terminated. |
| Pension Benefit Guaranty Corporation | 0.00 | 9 | Y | Pension plans will not be terminated. |
| Cornish & Carey Commercial, dba Newmark Knight Frank | 1,240,000 | 10 | N | Resolved by plan settlement. |
| State Compensation Insurance Fund | 129.00 | Sched'd | N | |
| Sunbow Properties, LLC | 105,000.00 | Sched'd | N | Allowed and to be subordinated |
| Travelers Insurance | 1,335.75 | Sched'd | N | |
| Barbaccia Properties Holdings, LLC | 1,337,298.82 | Sched'd | Y | No longer owed |

(b) <u>Treatment</u>. Allowed claims of general unsecured creditors (including allowed claims of creditors whose executory contracts or unexpired leases are being rejected under this Plan) shall be paid as follows: Each holder of such a claim, to the extent allowed by a Final Order,[2] will be paid 15.75%

---

[2] The term "Final Order" means: an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, that has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari or move for a new trial, re-argument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a new trial, re-argument or

(fifteen and three-quarters percent) of the allowed amount of such claim, plus a pro-rata share of net proceeds of the prosecution of claims against the Debtor's former counsel, Pahl & McCay, APC, as set forth in Part 7 herein, subject to the following:

1. Claim no. 1 filed by Pahl & McCay, APC in the amount of $29,771.16 is disputed and shall not be paid until, unless and to the extent, if any, allowed by a Final Order. The Debtor shall prosecute an objection to such claim.

2. Claim no. 3 filed by Cross River Bank in the amount of $24,630.00 is disputed and shall not be paid until, unless and to the extent, if any, allowed by a Final Order. The Debtor shall prosecute an objection to such claim.

3. Claim no. 4 filed by Peter Kane in the amount of $3,185,706.34 shall be allowed and paid in full (i.e., 100% of the claim rather than 15.75%), *provided, however*, that no payment on account of such claim shall be made by the Debtor until and unless all other payments required of the Debtor (as distinguished from payments required of the Special Representative) under this Plan have been made or have been accounted for with appropriate reserves under the provisions of Part 8(c) of this Plan.

4. Claims nos. 7, 8 and 9 filed by the Pension Benefit Guaranty Corporation, each in the amount of $0.00, shall be deemed withdrawn as of the Effective Date, in light of the continuation and maintenance of the pension plans administered by the Debtor, subject to the provisions of Part 9 herein.

5. Claim no. 10 filed by Cornish & Carey Commercial, dba Newmark Knight Frank ("Newmark"), shall be allowed in the amount of $1,240,000.00, as asserted in Newmark's proof of claim. Such claim shall be paid (a) $195,000.00 in cash on the Effective Date; and (b) a pro-rata share of net proceeds, if any, in any lawsuit brought against the

---

rehearing has been timely filed, or as to which any appeal that has been filed or any petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, re-argument or rehearing shall have been denied or resulted in no modification of such order.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 4 of 26

Debtor's former counsel, Pahl & McCay, APC, by Newmark acting as the Special Representative, as set forth in Part 7 herein.

6. The scheduled claim of Sunbow Properties, LLC, in the amount of $105,000.00, shall be allowed and paid in full (i.e., 100% of the claim rather than 15.75%), *provided, however*, that no payment on account of such claim shall be made by the Debtor until and unless all other payments required of the Debtor (as distinguished from payments required of the Special Representative) under this Plan have been made or have been accounted for with appropriate reserves under the provisions of Part 8(c) of this Plan.

7. The scheduled claim of Barbaccia Properties Holdings, LLC ("Barbaccia") shall be deemed disallowed as of the Effective Date, *provided*, however:

(a) As soon as practicable after the Effective Date, Mr. Kane shall provide to Barbaccia, through counsel, notice (the "Barbaccia Notice") of the provisions of this subpart 7, by electronic mail.

(b) If within fourteen (14) days following receipt of the Barbaccia Notice, Barbaccia files with the Court, and serves upon Mr. Kane, a claim against the estate herein and a written assertion of the amount that must be reserved therefor as a disputed claim (collectively, the "Barbaccia Assertion"), then, the Debtor shall either (a) file an objection to such claim on any grounds (including that it was filed after the claims bar date in the Chapter 11 Case) and/or challenge the amount of the required reserve asserted by Barbaccia; or (b) treat the filed claim as allowed and make a distribution thereupon in accordance therewith.

(c) If Barbaccia does not timely file and serve the Barbaccia Assertion, then Barbaccia shall be deemed to have no claim against the estate herein and shall receive no distribution under the Plan.

(d) The Bankruptcy Court shall retain jurisdiction to resolve any dispute under this subpart 7 by motion practice.

Creditors in this class may not take any collection action

against the Debtor so long as the Debtor is not in material default under the Plan (defined in Part 6(c)). **This class is impaired and is entitled to vote on confirmation of the Plan.**

**PART 2:** <u>**TREATMENT OF PRIORITY AND ADMINISTRATIVE CLAIMS**</u>

(a) <u>Trustee's and Professionals' Fees</u>. E. Lynn Schoenmann, the trustee in the preceding chapter 7 case (the "Trustee"), all professionals retained by the Trustee pursuant to Section 327 of the Bankruptcy Code in the chapter 7 case, and all professionals retained by the Debtor pursuant to Section 327 of the Bankruptcy Code in the chapter 11 case (collectively, the "Case Professionals"), shall file applications for final approval of fees and reimbursable costs no later than thirty (30) days following the Effective Date, upon which the Debtor will schedule a deadline for objections and a hearing, in accordance with applicable rules of the Bankruptcy Court. All such fees and costs approved by the Bankruptcy Court shall be paid in full by the Debtor within thirty (30) days following entry of a Final Order approving such fees and costs. Those fees and costs have been estimated by the Trustee and her retained Case Professionals to be as follows, as of September 30, 2022 (those fees and expenses are not expected to increase materially by the Effective Date); and the fees and costs of the Debtor's chapter 11 counsel have been estimated as follows, up to the Effective Date:

| Trustee and Case Professionals | Estimated Amount |
|---|---|
| E. Lynn Schoenmann, Trustee | 30,000 |
| Hall Law Group LLC, Bankruptcy Counsel for Trustee | 23,000 |
| Matthew J. Borror, ERISA Counsel for Trustee | 11,000 |
| Bachecki, Crom & Co., LLP, Accountants for Trustee | 20,300 |
| Mathew Metzger, Counsel for Chapter 11 Debtor | 10,000 |

(b) <u>Other Administrative Claims</u>. The Debtor will pay other allowed claims entitled to priority under Section 503(b) of the Bankruptcy Code no later than the latest of the following dates: (i) on, or as soon as practicable after, the Effective Date, or on such later date as to which the holder of such claim may have consented; (ii) on the date when such claim becomes due according to contractual, statutory or other terms applicable thereto; or (iii) as soon as practicable after entry of a Final Order allowing such Claim, if the Claim is disputed or if applicable provisions of the Bankruptcy Code otherwise require Court approval; except expenses incurred in the ordinary course

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 6 of 26

of Debtor's business or financial affairs, which shall be paid when normally due and payable (these creditors are not listed below). All fees payable to the United States Trustee as of confirmation will be paid on the Effective Date; post-confirmation fees owing to the United States Trustee, if any, will be paid when due. Asserted administrative claims, other than those held by the Trustee and the Case Professionals, are as follows:

| Name of Creditor | Amount of Claim | Claim no. | Disputed Under Plan Y/N | Plan Proponent's Comment |
|---|---|---|---|---|
| Office of the United States Trustee | 325.00 | N/A | N | (estimated) |
| Franchise Tax Board | 821.97 | 2 | N | |

(c) <u>Injunction and Voting</u>. Holders of administrative expenses may not take collection action against the Debtor so long as the Debtor is not in material default under the Plan (defined in Part 6(c)). **Such holders are not entitled to vote on confirmation of the Plan.**

(d) <u>Priority Non-Tax Claims</u>. The Debtor will pay allowed claims entitled to priority under Section 507(a) of the Bankruptcy Code at any time on or before the first anniversary of the Effective Date of the Plan. The following non-tax claims entitled to priority under Section 507(a) shall be deemed allowed in the following amounts:

| Name of Creditor | Amount of Claim | Claim no. | Disputed Under Plan Y/N | Plan Proponent's Comment |
|---|---|---|---|---|
| Jason Kane | 10,000.00 | 5 | N | |
| Christina Kane | 1,500.00 | 6 | N | |

(e) <u>Priority Tax Claims</u>. There are no allowable or asserted priority tax

**PART 3: <u>TREATMENT OF EQUITY SECURITY HOLDERS – Class B</u>**

(a) <u>Treatment</u>. Equity interests in the Debtor are within Class B. The sole shareholder, or equity security holder, of the Debtor is the plan proponent, Peter Kane. Mr. Kane shall retain his shares of stock of the Debtor, *provided* that no

distributions shall be made by the Debtor on account of such shares unless and until all of the Debtor's payment obligations owing under the plan have been satisfied in full.

(b) <u>Voting</u>. **Equity security holders are entitled to vote on confirmation of the Plan.**

**PART 4: <u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

(a) <u>Executory Contracts/Unexpired Leases Assumed</u>. The Debtor shall assume the following executory contracts and/or unexpired leases upon confirmation of this Plan and will perform all pre-confirmation and post-confirmation obligations thereunder.

| Description of Contract/Lease | Cure Amount |
|---|---|
| Kane Corporation Salary Deferral Plan | 0.00 |
| Kane Corporation Cash Balance Plan | 0.00 |

(b) <u>Executory Contracts/Unexpired Leases Rejected</u>. The Debtor rejects the following executory contracts and/or unexpired leases and surrenders any interest in the affected property, and allows the affected creditor to obtain possession and dispose of its property, without further order of the court. Claims arising from rejection of executory contracts, if any, have been included in Class G (general unsecured claims).

| Name of Counter-Party | Description of Contract/Lease |
|---|---|
| None | None |
| None | None0 |

(c) Executory contracts and unexpired leases not specifically assumed or rejected above will be deemed rejected.

**PART 5: <u>DISCHARGE AND OTHER EFFECTS OF CONFIRMATION</u>**

(a) <u>Discharge</u>. Debtor shall be discharged of all debts, claims, obligations and damages arising or accruing prior to the Effective Date of the Plan, *provided* that such discharge will not be effective until the Debtor (as distinguished from the Special Representative) has made all payments, or reserves pursuant to Part 8(c) herein, required of it under the Plan or the court grants a hardship discharge.

(b) <u>Vesting of Property</u>. On the Effective Date, all property of the estate and interests of the Debtor will revest in the Debtor pursuant to § 1141(b) of the Bankruptcy Code, free and clear of all claims and interests except as provided in this Plan, subject to revesting upon conversion to Chapter 7 as provided in Part 6(f) below, *except as follows*: All claims, damages, causes of action and claims for relief held by the estate against the Debtor's former counsel, Pahl & McCay, APC, as of the Effective Date shall be assigned to the Special Representative for the benefit of the estate, as set forth in Part 7 herein, without representation or warranty of any kind.

(c) <u>Plan Creates New Obligations</u>. Except as provided in Part 6(d) and (e), the obligations to creditors that the Debtor undertakes in the confirmed Plan replace those obligations to creditors that existed prior to the Effective Date of the Plan. The Debtor's obligations under the confirmed Plan constitute binding contractual promises that, if not satisfied through performance of the Plan, create a basis for an action for breach of contract under California law. To the extent a creditor retains a lien under the Plan, that creditor retains all rights provided by such lien under applicable non-Bankruptcy law.

**PART 6: <u>REMEDIES IF DEBTOR DEFAULTS IN PERFORMING THE PLAN</u>**

(a) <u>Creditor Action Restrained</u>. The confirmed Plan is binding on every creditor whose claims are provided for in the Plan. Therefore, even though the automatic stay terminates on the Effective Date with respect to secured claims, no creditor may take any action to enforce either the pre-confirmation obligation or the obligation due under the Plan, so long as the Debtor is not in material default under the Plan, except as provided in Part 6(e) below.

(b) <u>Obligations to Each Class Separate</u>. The Debtor's obligations under the Plan are separate with respect to each class of creditors. Default in performance of an obligation due to members of one class shall not by itself constitute a default with respect to members of other classes. For purposes of this Part 6, the holders of all administrative claims shall be considered to be a single class, the holders of all priority claims shall be considered to be a single class, and each non-debtor party to an assumed executory contract or lease shall be considered to be a separate class.

(c) <u>Material Debtor Default Defined</u>. If the Debtor (as distinguished from the Special Representative) fails to make any payment, or to perform any other obligation required of the

Debtor under the Plan, for more than 10 days after the time specified in the Plan for such payment or other performance, any member of a class affected by the default may serve upon the Debtor and the Debtor's attorney (if any) a written notice of the Debtor's default. If the Debtor fails within 60 days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the court an extension of time to cure the default; or (iii) to obtain from the court a determination that no default occurred, then the Debtor is in Material Default under the Plan to all the members of the affected class.

(d) <u>Material Special Representative Default Defined</u>. If the Special Representative fails to make any payment, or to perform any other obligation required of the Special Representative under Part 7 of the Plan, for more than 10 days after the time specified in the Plan for such payment or other performance, the Debtor or any creditor may serve upon the Special Representative and the Special Representative's attorney (if any) a written notice of such default. If the Special Representative fails within 30 days after the date of service of the notice of default either: (i) to cure the default; (ii) to obtain from the court an extension of time to cure the default; or (iii) to obtain from the court a determination that no default occurred, then the Special Representative is in Material Default under the Plan.

(e) <u>Remedies Upon Material Default</u>. Upon Material Default by the Special Representative, any member of a class affected by the default: (i) may file and serve a motion for such relief as is appropriate under the circumstances of the default.

(f) <u>Claims not Affected by Plan</u>. Upon confirmation of the Plan, and subject to Part 5(c), any creditor whose claims are left unimpaired under the Plan may, notwithstanding paragraphs (a), (b), (c), and (d) above, immediately exercise all of its contractual, legal, and equitable rights, except rights based on default of the type that need not be cured under section 1124(2)(A) and (D).

(g) <u>Effect of Conversion to Chapter 7</u>. If the case is at any time converted to one under Chapter 7, property of the Debtor shall vest in the Chapter 7 bankruptcy estate to the same extent provided for in section 348(f) of the Bankruptcy Code upon the conversion of a case from Chapter 13 to Chapter 7.

(h) <u>Retention of Jurisdiction</u>. The bankruptcy court may exercise jurisdiction over proceedings concerning: (i) whether

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 10 of 26

the Debtor or the Special Representative is in Material Default of any Plan obligation, and if so, the remedies to be ordered; (ii) whether the time for performing any Plan obligation should be extended; (iii) adversary proceedings and contested matters pending as of the Effective Date or specifically contemplated in this Plan to be filed in this court (see Part 7(f)); (iv) whether the case should be dismissed or converted to one under Chapter 7; (v) any objections to claims; (vi) compromises of controversies under Fed. R. Bankr. Pro. 9019; and (vii) other questions regarding the interpretation and enforcement of the Plan.

**PART 7:** **SPECIAL REPRESENTATIVE**

(a) <u>Appointment and Assignment</u>. As of the Effective Date:

(i) Newmark shall be appointed as a representative of the Debtor's estate (the "Special Representative") solely for the purposes set forth in this Part 7 of the Plan; and

(ii) The Special Representative shall be assigned, without representation or warranty of any kind whatsoever, any and all claims, damages, rights and causes of action (the "P&M Claims") held by the Debtor as of the Effective Date as against the Debtor's former counsel, Pahl & McCay, APC ("P&M").

(b) <u>Prosecution of PM Claims</u>. With the agreement of the Debtor as to a course of action that is in the best interests of creditors,[3] the Special Representative shall prosecute, compromise and/or abandon the P&M Claims on behalf of the Debtor's estate, and shall distribute net proceeds thereof, if any, to the Debtor, which in turn shall distribute such net proceeds to holders of allowed unsecured claims, subject to the following:

(i) <u>Costs</u>. To the extent that the Special Representative chooses to pursue the P&M Claims, Newmark shall advance all costs and expenses reasonably necessary in order to investigate and prosecute such claims.

(ii) <u>Concurrent Claims</u>. The Special Representative shall prosecute, compromise or abandon the P&M Claims concurrently with prosecution of Newmark's own claims

---

[3] In the event of a dispute between the Special Representative and the Debtor as to such prosecution, compromise or abandonment, the Bankruptcy Court shall retain jurisdiction to resolve such dispute by motion practice.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 11 of 26

against P&M.

(iii) <u>Cooperation</u>. The Debtor and Mr. Kane shall cooperate and consult with the Special Representative on a reasonable basis, as potential witnesses with respect to the P&M Claims. Newmark, both in its own capacity and as the Special Representative, on the one hand, and the Debtor and Mr. Kane, on the other hand, shall have the benefits and rights of confidentiality and other privileges associated with a common defense and prosecution, pursuant to an agreement to be executed by all such parties.

(iv) <u>Reporting</u>. No less frequently than once every calendar quarter, the Special Representative shall report to the Debtor on a confidential basis the status and intended schedule of its investigation, prosecution and/or compromise of the P&M Claims.

(v) <u>Distributions</u>. Upon partial or full resolution of the P&M Claims, either by litigation or settlement, the Special Representative shall distribute any and all proceeds of such claims as follows:

(1) From all gross recoveries arising from either the P&M Claims or Newmark's own claims against P&M, Newmark shall be reimbursed its costs, including legal fees, reasonably incurred in investigating, prosecuting and/or compromising such claims.

(2) After such cost reimbursements, remaining net proceeds shall be prorated between Newmark and the Debtor's estate based on the amounts of damages reasonably asserted by each party against P&M, as agreed upon by the Special Representative and the Debtor in good faith. In the event of a dispute between the Special Representative and the Debtor as to such allocation, the Bankruptcy Court shall retain jurisdiction to resolve such dispute by motion practice. The prorated portion of net proceeds attributable to the P&M Claims shall then be distributed by the Debtor to holders of allowed general unsecured claims against the Debtor's estate, consistent with the provisions of this Plan.

**PART 8: <u>GENERAL PROVISIONS</u>**

(a) <u>Effective Date of Plan</u>. The Effective Date of the Plan is a date to be designated by Mr. Kane, but in no event

later than 30 (thirty) days following the date of the entry of the order of confirmation, if no notice of appeal from that order has been filed. If a notice of appeal has been filed, Mr. Kane may waive the finality requirement and put the Plan into effect, unless the order confirming the Plan has been stayed. If a stay of the confirmation order has been issued, the Effective Date will be a date designated by Mr. Kane that is no later than 30 (thirty) days following the first day on which no stay of the confirmation order is in effect, provided that the confirmation order has not been vacated.

(b) <u>Condition to Effectiveness</u>. The effectiveness of the Plan is conditioned upon Mr. Kane's advance to the Debtor on the Effective Date in the amount of $280,000 in order to fund estimated Effective Date expenses. Thereafter, Mr. Kane shall advance additional funds to the Debtor to the extent necessary for the Debtor to perform its obligations under the terms of the Plan. Mr. Kane's advances to the Debtor, including the loan to be made on the Effective Date, shall be made to the reorganized Debtor, not to the debtor-in-possession, and shall therefore require no approval by the Bankruptcy Court other than confirmation of the Plan.

(c) <u>Disputed Claim Reserve</u>. Subject to the provisions of Part 1(b)(7) of the Plan, the Debtor will create a reserve for disputed claims. Each time the Debtor makes a distribution to the holders of allowed claims, the Debtor will place into a reserve the amount that would have been distributed to the holders of disputed claims if such claims had been allowed in the full amount claimed. If a disputed claim becomes an allowed claim, the Debtor shall immediately distribute to the claimant from the reserve an amount equal to all distributions due to date under the plan calculated using the amount of the allowed claim. Any funds no longer needed in reserve shall be distributed pro-rata among allowed claims in this class.

(d) <u>Cramdown</u>. Pursuant to section 1129(b) of the Bankruptcy Code, the Debtor reserves the right to seek confirmation of the Plan despite the rejection of the Plan by one or more classes of creditors.

(e) <u>Severability</u>. If any provision in the Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

(f) <u>Governing Law</u>. Except to the extent a federal rule of decision or procedure applies, the laws of the State of

California govern the Plan.

(g) Lawsuits. Mr. Kane's counsel has reviewed Debtors' schedules of prepetition transactions, and on the basis of that review does not believe that any causes of action for fraudulent transfers, voidable preferences, or other claims for relief exist, subject to the following:

(1) During the preceding chapter 7 case, the Trustee and her counsel and accountants investigated prepetition transfers made to or on behalf of Mr. Kane by the Debtor, as possibly avoidable transactions.[4] Mr. Kane, however, does not believe that any such transfers are avoidable, in part because: (a) all of the payments were made in exchange for adequate consideration; (b) all such transfers were made in the ordinary course of business; and (c) all such payments were made at times when the Debtor and Mr. Kane reasonably believed that the Debtor was solvent. Notwithstanding the Trustee's investigation, no demand had been made, or complaint had been filed, by the Trustee against Mr. Kane as of the date of conversion to chapter 11.

(2) Pursuant to Section 704(a)(11) of the Bankruptcy Code, the Trustee became responsible for the administration of two pension plans sponsored by the Debtor, as of the Effective Date. The Trustee stated to Mr. Kane, through counsel, that she was considering termination of the pension plans as part of such administration; however, Mr. Kane and the other beneficiaries of the pension plans argued that because such termination would not be in the best interests of the plans' beneficiaries, termination of the plans would be improper. Had the plans been terminated, over the Debtor's and Mr. Kane's objections and after anticipated litigation, an undetermined surplus of funds might have been obtained by the estate for the benefit of creditors.[5] No such termination had been commenced by the Trustee as of the date of conversion to chapter 11.

---

[4] In discussions with Mr. Kane's counsel, the Trustee did not identify a specific amount of targeted transfers. The Debtor's schedules, however, state that in the year immediately preceding the petition date, transfers made by the Debtor to or on behalf of Mr. Kane were in the net amount of $197,445.07. Additional transfers were made in the Debtor's ordinary course prior to the one-year period as well.

[5] As described below, in light of current estimated values of the plans, Mr. Kane does not believe that any surplus would be substantial.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 14 of 26

(3) The Debtor believes that it holds substantial claims against P&M on account of professional malpractice committed by the firm in its representation of the Debtor. Any such claims will be pursued by the Special Representative on behalf of the Debtor's estate and its creditors, at its discretion, concurrent with its pursuit of concurrent claims by Newmark against P&M in the same matters.

(h) <u>Notices</u>. Any notice to the Debtor or the Special Representative shall be in writing, and will be deemed to have been given seven days after the date sent by first-class mail, postage prepaid and addressed, or on the date of delivery by electronic mail, as follows:

<u>To the Debtor</u>:

    Kane Corporation
    Attn:  Peter Kane, President
    67 Selby Lane
    Atherton, CA 94027
    Email:  kanecorp2022@gmail.com

    With a copy to:

    Merle C. Meyers, Esq.
    Meyers Law Group, P.C.
    100 Shoreline Highway, Suite B160
    Mill Valley, CA 94941
    Email:  mmeyers@meyerslawgroup.com

<u>To the Special Representative</u>:

    Cornish & Carey Commercial d/b/a Newmark Knight Frank
    Attn:  Joshua Davis, Esq., General Counsel
    125 Park Avenue
    New York, NY 10017

    With a copy to:

    Nirav S. Shah, Esq.
    Cantor Fitzgerald
    110 East 59th Street, Seventh Floor
    New York, NY 10022
    Email:  nirav.shah@cantor.com

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 15 of 26

(i) Post-Confirmation United States Trustee Fees. Following confirmation, the Debtor shall continue to pay quarterly fees to the United States Trustee to the extent, and in the amounts, required by 28 U.S.C. § 1930(a)(6). So long as the Debtor is required to make these payments, the Debtor shall file with the court quarterly reports in the form specified by the United States Trustee for that purpose. In particular, without limiting the foregoing, in April 2023, the Debtor will pay quarterly fees to the United States Trustee for the first quarter of 2023, based upon distributions made in accordance with the Plan's terms, in the approximate amount of $1,240 (based on estimated approximate distributions of $310,000 in the quarter). Mr. Kane will advance funds to the Debtor to the extent necessary to make that payment.

(j) Deadline for § 1111(b) Election. Creditors with an allowed secured claim can make a timely election under section 1111(b) no later than 14 days before the first date set for the hearing on confirmation of the Plan.

(k) Means for Implementation of the Plan. The Plan will be effectuated by the Debtor. Among the Debtor's duties and authority will be the following:

(1) Plan Account and Deposit. On the Effective Date, the Debtor shall establish an account for the purpose performing its obligations under the Plan, and shall deposit into such account the amount of $311,000, including funds presently held by the Debtor and funds to be advanced by Mr. Kane. From time to time as needed, the Debtor shall deposit additional funds if required for such performance.

(2) Settlements and Objections. The Debtor shall have authority to enter into settlements if deemed by the Debtor to be reasonable and beneficial, object to claims, and generally take actions consistent with the terms of the Plan, without the necessity of approval by the Bankruptcy Court, provided that any compromise of a claim asserted against the estate for an amount greater than $250,000, will require ten (10) days' notice to creditors and an opportunity for hearing. In the event of a timely objection, the Debtor will schedule a hearing for Court approval on no less than ten (10) days' notice.

(3) Retention of Professionals. The Debtor may retain and compensate, without Bankruptcy Court approval, counsel and other professionals for the purpose of advising the Debtor and representing the Debtor with respect to the

implementation of the Plan, including without limitation counsel also representing Mr. Kane.

## PART 9:   PROVISIONS RELATED TO PBGC CLAIMS

(a)   Role of PBGC.   PBGC is the wholly owned United States government corporation and agency created under Title IV of ERISA to administer the federal pension insurance program and to guarantee the payment of certain pension benefits upon termination of a pension plan covered by Title IV of ERISA. Debtor sponsors the Pension Plan, which is covered by Title IV of ERISA.

(b)   Debtor's Continuation of Pension Plan.   The Plan provides that on the Effective Date, the Debtor shall assume and continue the Pension Plan[6] and shall pay in cash any aggregate unpaid (i) minimum required funding contributions, if any, under 26 U.S.C. §§ 412 and 430 and 29 U.S.C. §§ 1082 and 1083 and (ii) delinquent premiums, if any, owed to PBGC under 29 U.S.C. §§ 1306 and 1307, in each case with interest, for the Pension Plan under ERISA or the Internal Revenue Code.

(c)   Potential PBGC Claim for Termination.   During the bankruptcy proceeding, the Pension Plan may terminate under the distress termination provisions of 29 U.S.C. § 1341(c) or under the provisions for PBGC-initiated terminations under 29 U.S.C. § 1342(a).   If the Pension Plan terminates, the sponsor of the Pension Plan and all members of its controlled group are jointly and severally liable for the unfunded benefit liabilities of the terminated Pension Plan.   *See* 29 U.S.C. § 1362(b).   PBGC has filed unliquidated contingent claims, subject to termination of the Pension Plan during the bankruptcy proceeding, against the Debtor for unfunded benefit liabilities.   PBGC asserts that this termination liability claim is entitled to priority under 11 U.S.C. §§ 507(a)(2) and (a)(8) in unliquidated amounts.

(d)   Potential PBGC Claim for Contributions.   The sponsor of the Pension Plan and all other members of its controlled group are obligated to pay the contributions necessary to satisfy the minimum funding standards under sections 412 and 430 of the Internal Revenue Code and sections 302 and 303 of ERISA. PBGC has filed unliquidated claims against the Debtor for unpaid required minimum contributions owed to the Pension Plan.   PBGC asserts that the claims for required minimum contributions owed are entitled to priority under 11 U.S.C. §§ 507(a)(2) and(a)(5)

---

[6] Meaning, the Kane Corporation Cash Balance Plan, a single-employer defined benefit plan insured by PBGC and covered by Title IV of ERISA.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 17 of 26

in unliquidated amounts.

(e) <u>Potential PBGC Claim for Premium Payments</u>. The sponsor of the Pension Plan and all other members of its controlled group are jointly and severally liable to PBGC for all premium obligations owed to the Pension Plan. *See* 29 U.S.C. § 1307. PBGC has filed claims against the Debtor for unpaid statutory premiums, if any, owed to PBGC on behalf of the Pension Plan in an unliquidated amount.

(f) Potential PBGC Claim for Termination Premium. If the Pension Plan terminates in a distress or PBGC-initiated termination during the bankruptcy proceeding, the sponsor of the Pension Plan and its controlled group are liable to PBGC for a termination premium at the rate of $1,250 per plan participant per year for three years under 29 U.S.C. § 1306(a)(7). PBGC asserts that if the Pension Plan is terminated prior to confirmation of the Plan, the obligation to PBGC for termination premiums does not exist until after the Plan is confirmed and the Debtor has exited bankruptcy. PBGC asserts that under these circumstances, termination premiums are not a dischargeable claim or debt within the meaning of the Bankruptcy Code. PBGC estimates that the amount of the termination premium liability for the Pension Plan would total approximately $11,250.

(g) <u>Withdrawal of PBGC Claims</u>. Since the Plan provides that the Debtor will continue the Pension Plan, upon the Plan becoming effective and the Debtor making all payments due under Part 9(b) herein, all PBGC claims shall be deemed withdrawn without incurring liability in the bankruptcy.

(h) <u>Release Carve-Out Regarding PBGC</u>. Nothing in the Chapter 11 case, the Disclosure Statement, the Plan, the Confirmation Order, or any other document filed in the Chapter 11 case shall be construed to discharge, release, limit, or relieve any individual from any claim by the PBGC or the Pension Plan for breach of any fiduciary duty under ERISA, including prohibited transactions, with respect to the Pension Plan, subject to any and all applicable rights and defenses of such parties, which are expressly preserved. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such fiduciary duty or related liability by any of the provisions of the Disclosure Statement, Plan, Confirmation Order, Bankruptcy Code, or other document filed in the Chapter 11 case. For the avoidance of doubt, the Debtor shall not be released from any liability or obligation under ERISA, the Internal Revenue Code, or any other applicable law relating to or arising from the Pension Plan.

DATED:  December 7, 2022

                                        /s/ Peter Kane
                                    PETER KANE, Creditor and Sole
                                    Shareholder

**Attorney Certification**

I, Merle C. Meyers, am legal counsel for the Debtor in the above-captioned case and hereby certify the following: (i) the foregoing plan is a true and correct copy of the Combined Plan and Disclosure Statement promulgated by the Northern District of California, San Francisco Division, on July 30, 2012 (the "Standard-Form Plan"); and (ii) except as specified below, there have been no alterations or modifications to any provision of the Standard-Form Plan other than formatting, numbering and related non-substantive changes.

The following provisions of the Standard-Form Plan have been altered or otherwise modified:

1.     Introduction:  The summary description of Parts 1-9 is modified to account for different classes and more parts.

2.     Page 1 and Exhibits:  Standard Exhibit 3 (monthly income and expenses) and Exhibit 5 (Investment Property Analysis) have been eliminated as unnecessary – all required funds will be advanced by Mr. Kane, and there is no investment property.

3.     Page 2:  Standard Part 1 has been eliminated because there are no secured creditors.  New Part 1 covers general unsecured creditors.

4.     Page 2:  Class 2(a) (small claims):  Eliminated – all unsecured claims receive the same treatment.

5.     Page 3:  The term "Final Order" has been added and defined in footnote 2.

6.     Pages 3-5:  Specific treatment of particular unsecured claims is identified.

7.     Page 6:  Procedures for professional fee applications is identified.

8.     Page 7-8:  Part 3 added for treatment of equity security holders.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 19 of
26

9. Pages 8-10: Modifications made to account for distinction between defaults by the Debtor and defaults by the Special Representative.

10. Pages 11-12: Role, duties and scope of Special Representative identified.

11. Pages 17-19: Part 9, concerning claims of PBGC, has been added at PBGC's request.

I declare that the foregoing is true and correct. Executed this 7th day of December 2022.

MEYERS LAW GROUP, P.C.

By: /s/ Merle C. Meyers
    Merle C. Meyers, Esq.
    Attorneys for Debtor

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 20 of 26

**<u>Exhibit 1</u> - Events That Led to Bankruptcy**

A.  <u>General</u>

Kane Corporation, the Debtor, is a California corporation in the business of real estate consulting and management, and has operated since 1984 (other than during the preceding chapter 7 case. Peter Kane is its President, C.E.O. and sole shareholder, and the company employs Mr. Kane's son and daughter, Jason Kane and Christina Kane. The Debtor's revenues have varied over the years. In years 2019, 2020 and 2021 (partial), the company's revenues have been reported as $53,956, $82,098 and $35,924, respectively.

B.  <u>Barbaccia Litigation and Award</u>

In 2018, the Debtor and Newmark jointly sued Barbaccia for unpaid real estate commissions that the Debtor believed were owed to both the Debtor and to Newmark, in the California Superior Court, Santa Clara County. The litigation was referred to arbitration, and on July 26, 2021, after a trial before the arbitrator, the arbitrator issued an interim award denying the plaintiffs' claims for liability and finding that Barbaccia was the prevailing party entitled to recover attorneys' fees and costs. On October 29, 2021, the arbitrator issued his final award, finding Newmark and the Debtor jointly liable for Barbaccia's fees in the amount of $1,337,298.80. The arbitrator's decision was entirely unexpected by the Debtor and Newmark, inasmuch as the plaintiffs expected to prevail in the matter, and had been advised by their counsel that even in the event of loss, Barbaccia would not be entitled to recover fees or costs.

Thereafter, on or about November 3, 2021, Newmark reached a settlement with Barbaccia whereby Newmark paid Barbaccia the amount of $1,240,000 in exchange for a release of Newmark from any liability. Newmark has filed a claim in the Debtor's case for reimbursement of the full amount of its payment, and that claim is disputed by the Debtor. Further, the Debtor believes that any further liability to Barbaccia has been discharged by virtue of the payment by Newmark, which occurred without the Debtor's consent or knowledge.

C.  <u>Transfers to Mr. Kane</u>

In the normal course of the Debtor's business, Mr. Kane regularly made advances to the Debtor for operating expenses, and those advances were repaid from time to time by the Debtor's payment of Mr. Kane's personal expenses. As of the petition date in the Debtor's case, the balance of Mr. Kane's loan to the Debtor was in the amount of $3,185,706.34. In the year immediately preceding the petition date, the Debtor made payments to or on account of Mr. Kane in the net amount of $197,445.07. However, no such payments were made after the issuance

of the arbitrator's final award, as described above.

D.    <u>Commencement of Bankruptcy Case, Estate Assets</u>

Upon issuance of the arbitrator's final award, the Debtor determined that it required bankruptcy protection. Therefore, on December 17, 2021, the Debtor filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. E. Lynn Schoenmann was appointed as the Trustee, and the Trustee thereafter hired attorneys and accountants with Court approval.

As of the date of the petition, the Debtor's assets other than intangible property such as goodwill and client lists, consisted primarily of various notes receivable, potential claims against P&M for malpractice, and a used vehicle. During the course of the chapter 7 case, the Trustee liquidated the notes (all but one of which proved to be uncollectible) and the vehicle (which was sold to Mr. Kane). As a result of her liquidation, the Trustee collected approximately $31,000, which was turned over to the Debtor upon conversion of the case to chapter 11.

During the chapter 7 case, the Trustee investigated and considered pursuit of transfers by the Debtor to or for the benefit of Mr. Kane, as avoidable transfers, as described Subpart C above. However, Mr. Kane contended that none of the payments were avoidable, either as fraudulent conveyances or preferences for multiple reasons. The Trustee did not initiate any action against Mr. Kane to recover any of the subject payments.

The Debtor believes that it holds a malpractice claim against P&M, its counsel in the Barbaccia litigation, on account of incorrect and critical legal advice provided to the Debtor, resulting in the Barbaccia award. Under the Plan, the Debtor expects that such claims will be prosecuted, if economically and legally feasible, by the Special Representative for the benefit of creditors.

E.    <u>Pension Plans</u>

The Debtor is the sponsor of two pension plans, the Kane Corporation Salary Deferral Plan and the Kane Corporation Cash Balance Plan, which in the aggregate hold assets valued by the plans' administrator as of September 30, 2022 at approximately $2,122,209.37. The beneficiaries of the plans consist of Mr. Kane, Jason Kane and Christina Kane, employees of the Debtor. In the chapter 7 case, the Trustee became responsible for the administration of the plans, pursuant to Section 704(A)(11) of the Bankruptcy Code. The Trustee advised Mr. Kane that she was considering termination of the pension plans in order to recover potential surpluses for the estate. The potential amount of such surpluses is undetermined and dependent upon

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 22 of 26

multiple variables, including actuarial analyses, beneficiaries' rights to additional funds, excise taxes and administrative costs. However, based upon valuations made by the plans' institutional administrator as of September 30, 2022, Mr. Kane believes that any surplus, after liquidation of the plans' assets, payment of administrative costs and payment of all obligations owing to beneficiaries, would likely be minimal or non-existent. Nonetheless, for purposes of a liquidation analysis, referenced below, Mr. Kane has assumed a net surplus of $100,000.

Mr. Kane and the other beneficiaries of the plans took the position that because the beneficiaries of the plans would be ill-served by a termination, depriving them of the right to incrementally greater benefits over time, termination of the plans would violate the Trustee's fiduciary duties to those beneficiaries, precluding termination. Instead, the beneficiaries urged the Trustee to consent to a transfer of sponsorship to a new entity. Ultimately, with the conversion of the case to chapter 11, no action was taken by the Trustee to either transfer or terminate the pension plans.

F.   Settlement with Newmark, Conversion to Chapter 11

In an effort to avoid litigation over allegedly avoidable transfers, pension plan terminations and disputes as to Newmark's claim, Mr. Kane engaged in settlement discussions with Newmark to seek a consensual resolution that would allow the Debtor to resume its operations through conversion to chapter 11 and confirmation of a reorganization plan.  Those efforts were successful, resulting in a settlement that the Debtor believes is beneficial to the Debtor, its principals, and all creditors.  The terms of that settlement are incorporated into the Plan, as described below.


G.   Plan Terms

This is a summary only of the Plan's principal terms, subject to details and additional provisions stated in the Plan itself:

Under the Plan, the Debtor will continue in business, and Mr. Kane will continue in his role as president and chief executive officer. The Debtor's pension plans will continue to be administered by the Debtor, in the same manner as maintained prior to the commencement of the Debtor's chapter 7 case.

The Plan provides for partial payment of allowed claims in exchange for a discharge of the balance of those claims as against the reorganized Debtor.  The payments to creditors will come from two sources: (a) cash equal to 15.75% of allowed amounts of the claims (the

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 23 of 26

"Cash Component"), and (b) net proceeds of any claims pursued by the Special Representative against P&M (the "Litigation Component").

The Cash Component will be derived from cash on hand (approximately $31,000) as of the Effective Date and an advance to be made by Mr. Kane to the Debtor in the amount of $280,000 on the Effective Date. Mr. Kane will make additional advances to the Debtor if and to the extent needed in order to fulfill the Debtor's obligations under the Plan. The Cash Component will be paid to creditors holding undisputed claims on the Effective Date, and to other creditors when and to the extent that their claims are allowed by Final Orders. Newmark's claim in the amount of $1,240,000 will be allowed in full, and Newmark will receive a distribution of the Cash Component in the amount of $195,000 (slightly less than 15.75%) on the Effective Date.

The Litigation Component will be derived from net proceeds (after reasonable litigation costs are deducted) distributed on a pro-rata basis on account of allowed claims by the Special Representative upon the conclusion of prosecution of the P&M Claims, if pursued.

The Special Representative will be Newmark. Newmark was a co-plaintiff, and ultimately liable jointly, with the Debtor in the litigation of claims with Barbaccia, and both were represented by P&M in that litigation. As a result, Newmark and the Debtor hold similar claims against P&M, though with possibly varying calculations of damages. Under the terms of the Plan, the Debtor's claims will be assigned to Newmark for the benefit of creditors, and Newmark will determine in its sole discretion whether to prosecute, compromise or abandon the claims, along with its own claims, and will advance all expenses necessary to do so. In the event that the Debtor's claims against P&M are prosecuted or settled and result in recoveries, those recoveries (calculated proportionately with any recoveries on Newmark's own claims, will be used first to reimburse Newmark for all of its reasonable expenses and second to distribute to holders of allowed claims against the Debtor, on a pro rata basis.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 24 of 26

**Exhibit 2** - **What Creditors Would Receive if the Case Were Converted to a Chapter 7**[7]

Estate Assets:

| Description | Estimated Amount |
|---|---|
| Cash | 31,000 |
| Pension Plan Surpluses | 100,000[8] |
| Avoidable Transfers to Mr. Kane | 200,000[9] |
| Net Proceeds of Claims Against P&M | Unknown[10] |
| TOTAL: | 331,000 |

Estate Liabilities:

| Description | Estimated Amount |
|---|---|
| Chapter 7 Trustee's Fees/Costs | 40,000[11] |
| Chapter 7 Professional's Fees/Costs to date | 50,000 |
| Chapter 7 Professionals' Fees/Costs regarding pension plans | 50,000 |
| Chapter 7 Professionals' Fees/Costs regarding avoidance action | 75,000 |
| Chapter 7 Professionals' Fees/Costs regarding claims objections | 40,000 |
| Chapter 11 Debtor's Professionals' Fees/Costs | 10,000 |
| Priority Claims | 11,500 |
| NET FUNDS AVAILABLE FOR DISTRIBUTION TO CREDITORS | 54,500 |

| Description | Estimated Amount |
|---|---|
| Estimated Amount of Unsecured Claims | 621,465[12] |
| Percent Distribution to Unsecured Creditors Under Proposed Plan | 15.75% |
| Percent Distribution to Unsecured Creditors Under Liquidation Analysis | 8.77% |

---

[7] All estimates used for purposes of this liquidation analysis have been made by Mr. Kane in consultation with his counsel, using the upper range of predicted recoveries, and the lower range of predicted expenses, in a hypothetical chapter 7 liquidation, in order to present a chapter 7 outcome as favorable as possible, to compare to the proposed chapter 11 outcome.

[8] This is an estimate only, and assumes fully prevailing over opposition in anticipated litigation with the plans' beneficiaries.

[9] This is an estimate only, and assumes prevailing as to all transfers made within one year of the petition date, over opposition in anticipated litigation with Mr. Kane.

[10] Mr. Kane cannot estimate net recoveries with respect to these claims, but in any event those recoveries would be similar or less than such recoveries under the Plan.

[11] Estimated based on $800,000 of disbursements.

[12] Assumes that all disputed claims are disallowed, all insider claims are disallowed, and Newmark's claim is allowed at 50% of asserted amount.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 25 of 26

## **Exhibit 3** - **Effective Date Feasibility**

Can the Debtor Make the Effective Day Payments?

| | Amount | Amount |
|---|---|---|
| A. Projected Total Cash on Hand on Effective Date | | 311,000 |
| Payments on Effective Date | | |
| Unclassified Claims | 1,200 | |
| Administrative Expense Claims[13] | 100,000 | |
| Priority Claims | 0 | |
| U.S. Trustee Fees | 325 | |
| Allowed, Unsubordinated Claims (15.75% of 1,242,000) | 195,615 | |
| Reserves for Disputed Claims, Claims 1 and 3 (15.75% of $54,401.16) | 8,568 | |
| B. Total Payments on Effective Date | | 305,708 |
| **C. Net Cash on Effective Date** (Line A - Line B) (Not feasible if less than zero) | | 5,292 |

032

---

[13] Including those payments to be made upon Court approval following the Effective Date.

Case: 21-30819   Doc# 90   Filed: 12/07/22   Entered: 12/07/22 12:38:04   Page 26 of 26